**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF IOWA**

In the Matter of:

Erik J. Nielsen,  Case No. 09-04888-als7
Kathryn R. Nielsen

                Debtors  Chapter 7

Erik J. Nielsen  Adv. Pro. 10-30015-als

                Plaintiff

     v.

ACS, Inc.

               Defendant

Educational Credit Management Corporation

                Intervenor-Defendant

**MEMORANDUM OF DECISION
(date entered on docket: February 28 2012)**

Erik J. Nielsen ("Plaintiff" or "Nielsen") filed a joint voluntary chapter 7 proceeding with his spouse, Kathryn R. Nielsen, on October 7, 2009. This adversary proceeding, seeking discharge of his student loan obligations based upon undue hardship pursuant to 11 U.S.C. section 523(a)(8) (2010), was commenced pro-se[1] on January 21, 2010.[2] A Motion to Intervene was granted as to Educational Credit Management Corporation ("ECMC" or "Defendant").

---

[1] The Plaintiff in this proceeding has elected to represent himself, commonly referred to as acting "pro-se." Although a lawyer is not providing representation, the Plaintiff is not excused from compliance with the Code, Rules, court orders and directives. See Soliman v. Johanns, 412 F.3d 920, 922 (8th Cir. 2005); Schooley v. Kennedy, 712 F.2d 372, 373 (8th Cir. 1983).

[2] On this same date Debtor's spouse also filed three adversary proceedings: Kathryn R. Nielsen v. ACS, Inc., Case No. 10-30016, Kathryn R. Nielsen v. University Accounting Services, Case No. 10-30017 and Kathryn R. Nielsen v. Iowa Student Loan Liquidity Corporation, Case No. 10-30018. Neither Eric, nor Kathryn, are jointly liable for the other's individual student loan obligations.

During pre-trial hearings, this adversary proceeding, along with two adversary proceedings naming Kathryn R. Nielsen as Plaintiff, were consolidated for purposes of discovery and trial. Prior to the trial originally scheduled for September 7, 2011, the Plaintiff(s)' Motion to Continue was granted, and trial was rescheduled for November 2, 2011. On November 1, 2011, another Motion to Continue was filed by the Plaintiff(s). The Motion was denied as to Erik Nielsen, and his trial proceeded.[3]

As previously ordered, the Plaintiff supplied a written narrative to serve as his initial direct testimony. Due to the prior consolidation order, many of the parties' exhibits overlap in references to both Erik and Kathryn Nielsen. Erik Nielsen readily states that his wife has assembled most of the information related to his case, and he entrusted her with this task. Although the cases are no longer consolidated,[4] all exhibits, arguments, statements and information, whether supplied by Kathryn or Erik Nielsen have been reviewed and considered in the determination of this adversary proceeding as requested in the narrative submitted prior to trial.[5]

The court has jurisdiction of these matters pursuant to 28 U.S.C. sections 157(b)(1) and 1334. Upon review of the evidence and statements of the parties, the following findings of fact and conclusions of law are entered by the Court pursuant to Federal Rules of Bankruptcy Procedure 7052 and 9014. For the reasons set forth herein, the Debtor has failed to meet his burden of proof to discharge his student loan obligations based upon undue hardship.

---

[3] The Motion to Continue trial on the adversary proceedings involving Kathryn R. Nielsen was granted.
[4] See Memorandum of Decision filed at docket number 51.
[5] "Please note that all material facts relating to each above adversary number are relevant and ask for the Court to review and consider each respective narrative statement for Kathryn and Erik to be included for each other's statement as a married couple. The Exhibit List is being used for all adversary proceedings." Adversary Proceeding Number 10-30016, docket number 82.

## FACTS

Upon completing high school, the Plaintiff enrolled at ITT Technical Institute ("ITT") and successfully obtained an associate's degree in Applied Science for Electronic Engineering Technology. Beginning in 2000, Nielsen pursued a bachelor's degree at the University of South Dakota ("USD") on a part-time basis. Many general electives were completed, but he did not fully satisfy the requirements to graduate. The complaint asserts that in 2005, the Plaintiff "was forced to quit his bachelor's degree program to support his wife and child while they were dealing with their medical condition." He further explains that he discontinued his education due to stress and time constraints. Nielsen has been continuously employed full-time in his chosen field.

To finance his education, the Plaintiff incurred student loans from U.S. Bank. In 2005, his loans were consolidated. Eventually the outstanding student loan obligations were transferred to the Defendant for servicing and collection. At the time of trial, the Plaintiff owed total outstanding balances of $26,810 and $21,550 under two separate loans for a total obligation of $48,361.

## DISCUSSION

### DISCHARGE OF STUDENT LOANS

Under specific circumstances, the Bankruptcy Code permits the discharge of student loans. 11 U.S.C. section 523(a)(8) provides that "[a] discharge under section 727 . . . does not discharge an individual debtor from" any educational loan debt "unless excepting such debt from discharge under this paragraph would impose an undue hardship on the debtor and the debtor's dependents." The Plaintiff must establish an undue hardship by a preponderance of the evidence. Grogan v. Garner, 498 U.S. 279, 289-91 (1991).

The concept of "undue hardship" is not defined by the Bankruptcy Code. The Eighth Circuit has adopted an analysis involving the totality of a debtor's circumstances for the purpose of determining undue hardship. See Long v. Educ. Credit Mgmt. Corp. (In re Long), 322 F.3d 549 (8th Cir. 2003).[6] Undue hardship can be substantiated by a showing of a disability that prevents meaningful employment or by a verified inability to pay based upon income and living expenses. Three areas of inquiry are relevant to the analysis: "(1) the debtor's past, present, and reasonably reliable future financial resources; (2) a calculation of the debtor's and [his] dependent's reasonable necessary living expenses; and (3) any other relevant facts and circumstances surrounding each particular bankruptcy case." Id. at 554. Each of these areas will be considered separately.

1. Past, Present and Future Financial Resources

According to his resume, the Plaintiff worked for Mediacom from April 2001 until September 2008. In 2003, he suffered a work injury, breaking both of his wrists. Medical records identify a prior fracture of a bone in one arm. Upon completing his treatment, and based upon his impairment rating, a lump sum of $11,000 was paid under a worker's compensation claim. Over time, these injuries made it increasingly difficult for him to work outside and handle large ladders. Counsel Office and Documents approached the Plaintiff regarding potential employment as a service technician, which he accepted for a salary less than what he was making at Mediacom. When he voluntarily left his job at Mediacom, five years after his work injury, he was earning $30,000 annually. Plaintiff has been in his current job for three years, and his tax returns for calendar year 2010 reflect gross wages of $26,071. Kathryn Nielsen is not employed outside of the home, although she has obtained a master's degree.

---

[6] The Plaintiff may be mistakenly relying upon Bruner v. New York State Higher Educ. Servs. Corp., 831 F.2d 395 (2d Cir. 1987) to establish undue hardship. In re Long rejected the Bruner test in favor a less restrictive totality of the circumstances approach.

ECMC suggests that there may be opportunities in other locales for jobs that would pay more than the Plaintiff's current salary or that may provide more options for Kathryn Nielsen to obtain employment. The Plaintiff likes his job and admits that he has not explored other positions. He states there are opportunities for advancement with his current employer. Although there is no direct evidence in the record to support the inference that higher wages would be available if the Nielsens moved from rural Iowa to seek employment elsewhere, the Plaintiff does not appear open to exploring this possibility because of a lack of financial wherewithal to make a transition to a new residence that would meet the family's medical needs. The Plaintiff also claims that the possibility of a second job is not viable because it would jeopardize the government benefits that the Nielsens currently receive from Women, Infant and Children (WIC) and the SNAP program. When questioned about his spouse's ability to work, the Plaintiff states that he has not recently discussed this issue with her, and that his wife spends all of her time working on the paperwork for these adversary proceedings and raising their children.

The family has now elected to home school their children due to behavioral issues they are exposed to at public school, disciplinary policies in place at the local school and their religious beliefs. No medical condition or disability prevents the Nielsen children from attending public school. The decision to home school is personal to the Nielsens and must be made in what they believe is in the best interest of their family, however, it will no doubt affect the ability of Kathryn Nielsen to seek employment outside the home.

The exhibits submitted by the Plaintiff include information related to the federal poverty guidelines. Under the circumstances, the court presumes that this information is presented to establish that based upon his current wages and family size, he makes a minimum living that will

continue for the foreseeable future. Based upon current salary and family size,[7] the Nielsens are slightly above the poverty guidelines. Other relevant information related to their overall financial resources is not apparent from a strict monthly wage calculation. For example, pay advices identify Tech Bonuses which the Plaintiff has historically received. In 2010, this amount totaled $1,000. A much smaller amount is shown on a partial year of 2011 pay advices. The Plaintiff's employer also provides a $50 monthly cell phone allowance. While these amounts are included in annual income, it is not clear whether they are included in the monthly income calculations on the Current Income of Individual Debtor(s) ("Schedule I"). Further, on Schedule I, the Nielsens do not include, on line 11, the amount of government assistance received on a monthly basis. Under the SNAP program, the family receives $316 monthly. Although the WIC program does not provide a monthly cash amount, this benefit may be used to directly purchase certain foods which would result in a decrease in monthly food expenses.[8] Income tax returns indicate that tax refunds have increased each year as their family size has increased. According to the 2009 federal and state tax returns, the combined refund totaled $7,646. In 2010, the combined tax refund exceeded $8,800. There is no reason to believe these refund amounts will not remain at the same level in the future.

---

[7] At the time of trial, the Nielsen's family size was five, but it will increase to six in April 2012.

[8] The Current Expenditures of Individual Debtor(s) ("Schedule J") filed with the petition includes monthly food expenses of $500. Food expense is set forth in excess of $700 in Plaintiff(s)' response to discovery. A determination cannot be made as to whether the expense included on Schedule J was subject to actual cost increases experienced post-filing or whether the benefit amounts were not included as income, but deducted from actual food costs which resulted in a "net" food expense being included on Schedule J. It is noted that the Internal Revenue Standards, included in the Plaintiff's exhibits, allow food expenses in the amount of $757 for a family of four, with an overall increase of $262/month for each additional family member over four persons for food, clothing and other items.

    2. Reasonable Living Expenses

In 2005, the Nielsens were apparently exposed to mold based upon a Mold Screening Report made by ImmunoLytics of Albuquerque, New Mexico.[9] The information indicates that the report was sent to the Nielsens at an address in Vermillion, South Dakota. The results, as set forth on this exhibit, appear to be based upon samples supplied by the Nielsens. Although there were some instances of higher concentrations, the presence of mold did not generally exceed normal ranges. Nothing in the record indicates that the Nielsens moved due to the mold in their South Dakota residence. In 2006, the Nielsens state they were exposed to toxic mold in their rented apartment in Red Oak, Iowa. The Plaintiff contends that this situation, however, required his family to obtain a new residence. No information documenting this exposure was provided. In 2007, their current home was purchased. To insure that the new home was mold free, the Nielsens claim they incurred substantial debt. The record is unclear whether these amounts were included in their bankruptcy filing and have now been discharged, or whether required improvements were paid in cash. No receipts were provided to reflect the total amounts expended in cash or credit.

The relevant inquiry under this factor is whether a debtor's expenses are reasonable, and if these expenses can be met under current income on an ongoing basis. "To be reasonable and necessary, an expense must be 'modest and commensurate with the debtor's resources.'" Educ. Credit Mgmt. Corp. v. Jesperson (In re Jesperson), 571 F.3d 775, 780 (8th Cir. 2009) (citing In re DeBrower, 387 B.R. 587, 590 (Bank. N.D. Iowa 2008)). As a general proposition, the cases addressing this issue provide that "[a] minimal standard of living requires that the debtor have sufficient financial resources to satisfy needs for food, shelter, clothing and medical treatment." Brown v. Am. Educ. Servs., Inc. (In re Brown), 378 B.R. 623, 626 (Bankr. W.D. Mo. 2007).

---

[9] This inference is drawn from the exhibits but was not addressed during the testimony at trial.

While any family could appreciate and make use of additional income, it appears that the Nielsens are able to maintain a basic standard of living.

The Plaintiff urges the Court to find that possible future expenses prevent him from making payment on the student loans. Specifically, reference is made to the purchase of new tires for $637.72; two specialized queen mattresses for their children for $3,298; and a new roof and siding for a total of $7,000. An exhibit also reflects a quote to replace air conditioning damaged by lightning in the amount of $1,883.51. The record does not substantiate that these expenses are reasonable or necessary at the current time, nor are they routinely experienced on a regular basis. This evidence, standing alone, does not represent an undue hardship sufficient to discharge the student loan obligations.

3. Additional Relevant Facts and Circumstances

To completely evaluate an individual's ability to repay student loans without undue hardship, the court must analyze other relevant factors in each individual case. Guidance as to the types of factors that may be considered include:

> (1) total present and future incapacity to pay debts for reasons not within the control of the debtor; (2) whether the debtor has made a good faith effort to negotiate a deferment or forbearance of payment; (3) whether the hardship will be long-term; (4) whether the debtor has made payments on the student loan; (5) whether there is permanent or long-term disability of the debtor; (6) the ability of the debtor to obtain gainful employment in the area of the study; (7) whether the debtor has made a good faith effort to maximize income and minimize expenses; (8) whether the dominant purpose of the bankruptcy petition was to discharge the student loan; and (9) the ratio of student loan debt to total indebtedness.

In re Brown, 378 B.R. at 626-27 (citing VerMaas v. Student Loans of N.D. (In re VerMaas), 302 B.R. 650, 656-57 (Bankr. D. Neb. 2003); Morris v. Univ. of Ark., 277 B.R. 910, 914 (Bankr. W.D. Ark. 2002)). While helpful, some of these areas are duplicative of the totality of the

circumstances test and may not be relevant to the facts of a specific case. See Hangsleben v. United States of America (In re Hangsleben), No. 10-30178, Adv. No. 10-7018, 2011 WL 2413340, at *6 (Bankr. D.N.D. June 10, 2011).

Much of the Plaintiff's case focuses on the issues related to his family's mold exposure. The Plaintiff suffers from headaches when mold is present in a building. To counteract this symptom, he carries essential oils. Although there is an effort to construe his mold sensitivity as an allergy, or more serious medical condition, the only medical records in evidence do not specifically identify such a diagnosis. A series of allergy tests and doctor's notes have been provided in an effort to substantiate this portion of the Plaintiff's case. The majority of this information relates to treatment for his work-related injury and complaints that appear to arise from infections, various allergies, or other common ear and sinus ailments. The Plaintiff has clearly not been diagnosed with a disability, is unrestricted in his ability to work and participate in regular activities, and can be in public places. Medical records are also provided for other members of the family. The notes from one doctor indicate that the Nielsens reported a family history of ear problems, were reluctant to permit treatment by antibiotics, and had been pursuing alternative home remedies related to treatment for what appears to be ear infections for their oldest child. Although it is stated that a doctor has ordered the Nielsens to live in a mold free environment and follow a specialized diet, no such directive is contained in the exhibits.

The Plaintiff included articles discussing problems and ailments involving mold and actions which can be taken to avoid potential mold-related medical issues. Much of this information is derived from a mold remediation consultant based out of Knoxville, Tennessee. The symptoms and recommendations described are not medically based and are of questionable credibility due to their source. Undue hardship cannot be based upon reliance on general

information and conclusions related to the potential dangers of mold, in the absence of medical evidence or testimony.  In re Hangsleben, No. 10-30178, Adv. No. 10-7018, 2011 WL 2413340, at *5.

The Plaintiff claims that substantial expense was involved in the renovation of his current home which was necessary to provide a mold free environment.  These efforts allegedly prevent him from moving to another community to seek a higher paying job.  His description of the work involved can be summarized as using essential oils in the paint for the interior rooms and diffusing essential oils into the air.  This information is not consistent with the detail provided by his spouse as to the required work to satisfactorily outfit their home to resolve potential or perceived mold issues.   Under either scenario, the record does not include any detail as to why the work was necessary, why the work needed to be completed in a certain period of time, what specific expenses were incurred from this undertaking and why these efforts could not be economically accomplished in a different residence.

Qualification for an Income Contingent Repayment Program ("ICRP") is also a relevant factor in evaluating undue hardship, because "a student loan should not be discharged when the debtor has 'the ability to earn sufficient income to make student loan payments under the various special opportunities made available through the Student Loan Program.'"  In re Jesperson, 571 F.3d at 781 (citing In re VerMaas, 302 B.R. 650, 660 (Bankr. D. Neb. 2003)).   According to ECMC, the Plaintiff qualifies for the ICRP, under which monthly payments are calculated based upon an annual review of income.  At the time of trial, based upon income and family size, there would be no payment required from the Plaintiff.  In fact, Mr. Nielsen's annual income would need to exceed $55,000 prior to being required to make any payments on his student loans.

When questioned about the possibility of participation in the ICRP, the Plaintiff raises several issues, none of which is persuasive to his case. First, he contends that because his loans are currently in deferment, he is technically not in default under the loans, making him ineligible for the ICRP. This argument must be rejected based upon the evidence that shows the Plaintiff qualifies to participate in the ICRP. Second, the Plaintiff states that his children will be denied student loans if he agrees to such a repayment plan. This position must also be rejected based upon the exhibit submitted by ECMC that informed the Nielsens that the issue of whether their children could obtain student loans is unrelated to any participation in the ICRP.

Third, the Plaintiff complains that he will be unable to pay the taxes owing after the expiration of the 25-year repayment period. This conclusion appears to be based upon possible tax consequences that could arise due to debt forgiveness. The Nielsens, admittedly, have not engaged an accountant or other tax professional to assist them in making a determination of potential tax liability resulting from the Plaintiff's participation in the ICRP. Instead, they seek a determination that there will be no tax liability from the Defendant (or the IRS). Because no one, including the Plaintiff, can know what his financial situation will be in 2037, a calculation of any tax liability resulting from debt forgiveness is impossible at this time.[10] See 26 U.S.C. § 108(a)(1)(B). The mere possibility of tax consequences at the expiration of the 25-year repayment period is not dispositive of the issue of whether the ICRP represents a viable avenue for repayment of student loan debt.

Fourth, the Plaintiff explains that he wants to explore his other options (presumably whether his loans will be discharged as a result of this adversary proceeding). This statement

---

[10] Pursuant to 11 U.S.C. § 108(a)(1)(B), at the conclusion of the repayment time period, taxable income will only result if the Plaintiff's assets exceed the total amount of the student loan debt that is canceled at that time.

contradicts his testimony that he would attempt to repay the outstanding student loans if he had the ability.

Prior to the bankruptcy filing, the family was paying over $1,000 monthly to service credit card debt that has now been discharged. Substantial tax refunds are received each year, and last year these funds were utilized to repay a car loan to a relative. The Plaintiff has a retirement fund and equity in his home. Although the Plaintiff states he would like to repay his student loans, his efforts appear less than sincere based upon self-imposed limitations and obstacles.

Applying the ICRP guidelines, based upon the Plaintiff's current income and expenses, no monthly payment is required. To the extent the Plaintiff's salary substantially increases, he may then be required to make some payment on his student loan obligation. Such a development would be consistent with his stated desire that he would repay his student loan obligation if he had that ability. Until the contingency of increased income is met, his monthly payment is zero, and consequently, his participation in the ICRP does not impose an undue hardship on the Plaintiff or his dependents.

For the reasons stated herein, the Plaintiff has not sustained his burden of proof to discharge his student loans based upon undue hardship.

## OTHER LEGAL ISSUES

Additional arguments were contained in the trial stipulation filed by the Plaintiff[11] that are unrelated to the discharge of student loans based upon undue hardship. These are addressed here to complete the record.

---

[11] Pursuant to the consolidation order, this document was filed in Adversary Proceeding Number 10-30016 at docket number 41.

The Plaintiff asserts that either, or both, ACS, Inc. and ECMC may have violated the automatic stay. The basis for this argument appears to rest on the fact that the Plaintiff's student loan was in deferment and was changed to a default status after the filing of bankruptcy. The record does not include any reference to collection attempts by either of these parties; does not identify any damages sustained by the Plaintiff due to the alleged action; and was not supported by any argument related to this claim. Administrative coding related to the status of the loan is not relevant to the complaint requesting discharge of the student loans for undue hardship. The Plaintiff's general discharge was entered on January 26, 2010. On this date, the automatic stay expired by operation of law. See 11 U.S.C. § 362(c)(2)(C). To the extent the acts complained of occurred after entry of the general discharge, there is no violation of the automatic stay. To the extent any relief is requested by the Plaintiff under this argument, it is denied.

The second issue can be summarized as Plaintiff's assertion that the Defendant is not in compliance with Minnesota state law due to its failure to register an assumed name. Educational Credit Management Corporation utilizes its initials "ECMC" for purposes of identification. This acronym does not qualify as an assumed name or its legal identity. As set forth on the record at the time of trial, the separate motion filed and captioned as "Pleading Intervenor's Failure to File Certificate of Assumed Name in Accordance of Incorporating State of Minnesota" was denied.

IT IS THEREFORE ORDERED that:

1. The Plaintiff's student loan obligations owing to ECMC are not discharged based upon undue hardship;

2. The complaint is dismissed;

3. The parties shall bear their own costs.

/s/ Anita L. Shodeen
Anita L. Shodeen
U.S. Bankruptcy Judge


Parties receiving this Memorandum of Decision from the Clerk of Court:
Electronic Filers in this Adversary Proceeding
Others: Erik J. Nielsen, Plaintiff